Good morning, Your Honors. Thank you. May it please the Court and Counsel, Alexander Jayden, on behalf of the appellant, Rymer Companies, also known as the Rymer Companies Inc. in Cannon Falls Mall. We're going to call them Rymer just for simplicity. Your Honors, in the simplest sense, we're fighting over 1,200 square feet of a roof, and we'll go into the law and the concept behind that, but in the simplest concept, it's 1,200 square feet of a roof is what this dispute is really about. We're also here before the Honorable Court because our position for Rymer is that the District Court created a but-for cause in the policy analysis that does not physically exist in the policy. Counsel, I'd like to ask you about that right out of the chute. I guess I'm not really sure. Even if we interpreted the words resulting in as having a but-for meaning, why isn't the storm damage the but-for causation of the roof having to be replaced? Outstanding question, Your Honor. That would be my second argument to this. My primary argument is that that but-for causation is not there. You hit the nail on the head. The language is resulting in, which makes a much broader question of connectivity to the action. But even if we did go with this but-for causation that the District Court created, you know, but for this tornado, but for the damage that the appraisal panel found on the roof, but for those scope of repairs, but for the application for a building permit that was denied, this additional coverage would not need to apply. Without that denial of a building permit, we would not need to trigger the additional coverage in the policy. As the Court well knows, we look at a policy I can describe as a tennis match. We have the primary coverage of the policy. That's the tornado in this case. Then we look to what exclusions may apply in the policy. There is an exclusion that says we don't pay for ordinance or mall coverage unless it's otherwise provided in the policy. At that point, the ball has been hit back to the other side, right? We go to the additional coverage that's in Section A, 4G of the policy. I want you to do the addendum that is on page 78 of RIMER Appendix. And that lays out what this additional coverage is. If a covered loss occurs, no dispute there was a covered loss, there was a tornado, right? Resulting in the enforcement of an ordinance and law. It's plain in the record that an application was made to the Goodhue County Building Official. That application was summarily denied. Let me just make sure I understand. Resulting in, in your view, is a lower standard than but-for. Is that fair? Yeah, I would say that that is a lower standard. I think but-for creates a closer causal connection. But I think in this scenario under either standard, there should be coverage for this ordinance and law, additional coverage in the policy. Let me follow up on that, which is, and I know this is not on point, but it tells us what the plain and ordinary meaning of results from is. So there's a case called Barrage. It's a criminal case. And it says, it's a Supreme Court case where there's no textual or contextual indication to the contrary. Courts regularly read phrases like results from to require but-for causality. What that's saying is, I know it's in the context of its statute, but a word like result from requires but-for causation. Do you disagree with that then? I don't have a position to disagree with that. My disagreement would be results from is not the language in the policy. Results in is the language in the policy. Well, that's fair. But doesn't that just flip the causal area, or causal arrow? Doesn't it just basically go from, instead of results from, now you say it just the opposite way of saying the same thing? I think it is opposite looking, but I don't think it's two sides of the same coin. Because when we're talking about a causal chain within an insurance claim, I think what direction you're looking actually does matter. I think resulting from is past looking. I think resulting in is future looking. The additional coverage is an ordinance and law coverage. To me, that is future looking from the loss, because we don't know if that ordinance or law is going to be applicable until after the loss has been either adjusted or adjudicated, in this case via an appraisal panel. At that point is the first time we can take that scope of repairs and provide it to the building official to see how they're going to apply and interpret that ordinance or law. So being that it's future looking from the data loss, I do think that it is a distinct difference in here in which direction you're looking on the causal chain, Your Honor. That's true, even though the underlying verb resulting is exactly the same. All you're doing is you're flipping the preposition. You're not really changing the verb. We're not changing the resulting. I totally agree. But I do think there is a distinct difference between going from, backward looking, and in, forward looking on this. And I think that makes all the difference when we're talking about additional coverages in the policy. So is there a case that holds what you're suggesting here? No, there's not. And this was one of the arguments of the district court. And that's where I think maybe the court got into the analysis of kind of what I would say is conflating this from, in, and the but-for causation. There was a back and forth on what the proper standard was. And the court went with this but-for standard. And as Judge Bras said, I think even under this but-for standard, I believe there's still coverage for it. Let me ask you this. So the tornado damage, obviously your client didn't fix the wet roof prior to the tornado. That's correct. And I understand it was not required to by the building code. That is correct. The tornado damage, did the building code require that to be fixed? It's a little more complicated. So let me try to give you as succinct of an answer as possible. The tornado caused damage to the roof, specifically 120 linear feet of the metal flashing. If you think it's a flat roof system with a parapet wall on it, a built-up roof. So there's 120 feet of damage the panel found to that built-up roof, the flashing on it. But in addition, they found 10 feet of damage into the feet of the roof. When I started, I said this dispute was over 1,200 square feet. It's those 1,200 square feet of damage in the field of the roof that is all the difference. If the only damage in this case was that 120 feet of metal flashing, this building code issue I don't believe is triggered. It's fixing that 1,200 square feet of roof that triggers the building code. The fact that it was wet before this doesn't matter. Minnesota provides that we have a concurrent causation standard, is our default standard. Minnesota law allows carriers to write in anti-concurrent causation language. They did not do that in this case. Had this policy had anti-concurrent causation, there could have been a limitation that if there was other damage to the roof, it was previously what? We don't pay for any of the damage. But again, going to what specific language is in this policy, it's not there. So when we go to the building official and say, the appraisal panel told us we need to fix 1,200 square feet of this flat roof section. Well, is that what the appraisal panel said or did they say that was damaged and you were entitled to money out of the policy? Within their diagrams and the subsequent explanations from the parties, if you look to, I think a good example is RIMER Appendix 243, they have repairs that need to be made to those 10 feet into the field of the roof, right? Yes, that roof was previously what? Parts of the roof, not the whole roof. But parts of that roof were previously what? So in short, RIMER cannot make any of the repairs from this appraisal award without complying with the building code. The building code tells us we have to replace the full roof because it was what? The policy provides for coverage for when an ordinance or law, which regulates the construction or demolition of a building and is in place at the time of the loss, is enforced. Well, let me ask you this. So Judge Kobe has asked the question that, and I don't know that I got an answer to it, which is, did you, once the damage occurred, did the building code or the city require you to fix that $25,000 worth of damage? Or could you have just pocketed the money, like a lot of homeowners do, and taken it to the bank and spent it on something else? Yes, you wouldn't, the building code did not require repairs from the insurance claim. However, to make the repairs from the insurance claim necessarily implies the, or triggers the building code. So that gets us back to the plain language then, because it says that the covered cause of loss must result in the enforcement of an ordinance or law, and then, you know, the rest of the language. Yes. And here, Judge Tostred said, no, it wasn't the damage that caused the denial of the permit. It was the fact that it had preexisting problems that made it waterlogged. And that seems to me to fall directly into the plain language of this provision. Why doesn't it? Because the reality, and I think that it'd be an unfair burden to put on a policy holder to say, your building code never gets triggered if you never make the repairs. I agree with that. But that's not really what the purpose of a replacement cost insurance policy is. The intent is to make the repairs. And what we're saying is, to make those repairs to that 1,200 square feet of roof, I can't do it. So I have an insurance policy, I have an insurance claim, I have an adjudication of what the damage is and the scope of how to repair them. The building code doesn't allow me to do it. That absolutely, this damage absolutely resulted in the enforcement of an ordinance and law of this building code and is preventing my clients from being able to make the repairs to the roof. I, you know, I agree that there's an element of unfairness. But when you go to the policy itself, I mean, the problem I have with it is the reason why you can't make the repairs is because the roof was in a preexisting state of disrepair. And so the insurance company, I'm sure, is going to come up here and say, well, it's completely unfair that we have $25,000 worth of damage according to the appraisal panel, but the insured wants us to pay $1.2 million or however much it is or $2 million to repair the entire roof, which is already in a state of disrepair. What's the response? It might be unfair. It doesn't matter. The insurance company had plenty of options here. I talked earlier about the ability to write anti-concurrent causation of the policy. They didn't do it. Let's talk about what else they didn't do. It's undisputed that the insurance company also knew that this roof was, what, up to five or six years before this loss. They didn't cancel the policy. Could have done that. They didn't demand that the insured make the repairs to maintain the policy. They didn't attempt to convert the policy into an actual cash value policy, which would address Your Honor's issue about you wouldn't have been required to make the repairs. And they didn't add any of this anti-concurrent causation language. So to say that they're a victim or didn't understand the potential eventualities of what could have happened here, I don't think is true, Your Honor. And is it unfair? I mean, life's not fair. Maybe it is a little unfair to the insurance company. Our position is they had plenty of opportunity, ability, knowledge, and, you know, a basis to be able to make these changes, and they did not do so. So if we're balancing fairness, Your Honor, I believe with the totality of the knowledge, the decision that's been made, and I do think the plain language of the resulting in enforcement of this building code, I think if we're balancing fairness, I think the unfairness is to the policyholder to say, you had an insurance claim. You can't make the repairs. Too bad. Was there a requirement in the policy that the repairs be made? Sometimes the policy or the insurance company will call up and say, we just paid you $40,000 for a brand new roof, a completely new roof. And we want to know because we want to know whether we need to reduce coverage because you haven't, you haven't changed the, you haven't fixed the roof. Was there any kind of requirement that all the money you get from the, from the policy go into replacing the roof or fixing the roof? Not that I'm aware of. I can only give you more of the general terms in that it is a standard RCV, our replacement cost policy. You would get paid the actual cash value and you get paid the replacement cost when you make the repairs. I believe in the award. I do believe since I made the full amount of the repairs, but it doesn't change the analysis. That's not a loophole to use to get away from the enforcement of the other provisions. Counsel, you are on your rebuttal time. If you'd like to save it. Yes, I would. I'd like to reserve the rest. Thank you, Your Honor. Mr. Kane, you may proceed when you are ready. Thank you, Your Honor. Good morning. May it please the court, counsel. My name is Anthony Kane. I represent the Cincinnati Insurance Company in this matter. Certainly, the focus of the prior conversation was the policy language requiring that the covered loss result in the enforcement of an ordinance or law. First, I would like to point out that the email referenced by counsel for Reimer was sent from one member of the appraisal panel as opposed to the entire panel. Importantly, the storm event or they've referred to it as a tornado. So I'll use the term tornado. The tornado resulted in the removal of approximately five areas of cap flashing on the parapet perimeter of the roof. At the time of the appraisal of the loss, all of that cap flashing had been repaired. The policy provides that it will cover the enforcement of an ordinance in the event of a covered loss, provided that covered loss results in the enforcement. In this case, clearly, Reimer, there was testimony from witnesses at the appraisal. Lon Erlinson, a professional engineer from PI, testified that the replacement of the cap flashing was clearly what would be referred to as a minor repair, something that did not require the issuance of a building permit. However, Mr. Simon, Phil Simon, was the contractor retained by Reimer. Mr. Simon testified that the repair of the cap flashing required complete replacement of the entire roof at the mall. Obviously, based on the award, the appraisal panel determined that that was not the case. I do want to... How far does your rule go? I'm going to give you a hypothetical. I don't know much about roofing, so I'm making it up as I go along, which is this. Suppose that you have the same facts, except for the county now comes in, or the city comes in and says, well, you know what needs to happen is we require 20 roof vents versus 10 roof vents now, according to the building code. It's in a perfect state of repair. The roof is great. You just have this little space that was damaged by the storm, but all of a sudden now they have to put in 10 more roof vents, and that costs X amount of money. Would that be covered as part of this particular policy? If the specific damage resulted in the enforcement of that particular section of the building code, yes, it would. But the other piece that's being ignored here is the ordinance or law coverage applies to undamaged property. It's unquestionable, and Reimer admits that this roof has been water soaked since at least 2014. And again, contrary to Reimer's arguments, there is, for example, the easy example, let's say we were talking about the cap flashing and the fact that the cap flashing had been blown off areas of that roof. Say a piece of the cap flashing that was blown off during the course of the tornado, the storm, and that cap flashing pierced the water soaked roof and damaged it. Now we would have an event, a storm event that's covered that resulted in damage to the already compromised roof. Counsel, what I hear you saying is that it has to be a cause of the damage, and the policy says resulting in. And I've looked at dictionary definitions of resulting. Some of them mean cause. Some of them mean consequence, forward looking versus backward looking. But I think you have to look at the policy as a whole, and if you go down a couple sentences, the policy says that Cincinnati will pay when the increased cost is a consequence of enforcement of a building ordinance. Doesn't the use of the word consequence indicate that the prior use of resulting means consequence rather than cause? I would argue again that the policy is requiring that the covered event result in the enforcement of the code. In this case, it was not the tornado that removed the cap flashing that resulted in. What resulted in the enforcement of the code in this case, then, in your view? As the district court stated, the permit and the permit that was submitted by Phil Simon post appraisal was designed to be rejected by the Goodhue County building inspector. The roof, the existing soaked, water soaked roof, was the, he phrased it as, all right, we need to go and replace five areas of cap flashing with this claim, then, again, that 120 feet of additional, I think, EPDM roof membrane, whatever the material was. To tie in to the water soaked roof, which he specifically referenced it as the water soaked roof. Again, I want to go back to the fact that it has to be undamaged property. Undamaged property. In this case, that property was already compromised. But again, if a covered cause of loss resulted, another example, say I, my house, I incur hail damage at my house. I get paid by the insurance company for hail damage. I decide, you know, I can live with, I'm going to keep the money and I'm going to live with the hail damage roof. Subsequently, a fire breaks out in the attic of my home and burns through and damages the roof. In that situation, despite the fact that the fires are covered cause of loss, it's now damaged the roof. Even under those circumstances, the carrier is going to be responsible for replacing that roof. In this case, again, the water soaked roof is undamaged and had been in place since 2014. There was no damage, no covered cause of loss occurred to that roof surface. Nothing that would compel, again, I could, even I, a lawyer, could write a building permit that could get, that I could phrase to get rejected. And importantly, so, you know, in my, I'm just trying to, I'm trying to iron, you know, figure this out, but in my roof vent example, suppose that 50% of the roof is destroyed, or not destroyed, but damaged by the wind. So, would Cincinnati's viewpoint be if you have to go from 10 to 20 roof vents, we'll pay for five. Because we'll pay for the five that are on the damaged portion of the roof, but we're not going to pay for the five that are on the undamaged portion of the roof. That, is that sort of, so it has to be damaged and any requirement then for the damaged portion gets paid for? What, what is the, the two things that are required under the policy, the ordinance or law coverage, is that the covered loss results in the enforcement of the code. In this case, and I want to, the one thing I want to make explicit, Reimer specifically requested that the appraisal panel determine the scope of damage, including the applicability of any building codes. That was part, that matter was brought to the appraisal panel and decided by the appraisal panel, consistent with Quade. Again, under certain circumstances, if, if again, if the compromised roof had suffered a cause of loss, a covered cause of loss, like I said, the, a piece of the, the cap flashing, pierced the, the water-soaked roof. That would result in, in coverage and replacement of the entire roof. That's not the situation here. So, I think the answer you're, I didn't quite catch it, but I think the answer is yes, so that if there's damage to that portion of the roof, then you have to comply with the code requirements for that portion of the roof. But we're not going to pay for the whole roof. Exactly. There has to be a causal connection between the loss and the enforcement of the code. In this case, that roof was, was previously damaged. We, the best case, it's an unpublished Minnesota Court of Appeals case. It's the St. Matthew's Church of God v. State Farm, 2021 Westlaw 442-8919, where they go into this exact same issue. The church suffered a loss. There was, during the course of that, there was a, an area of the property that was required code compliance and that the building, St. Paul building official was not going to issue a building permit absent having this, this particular condition covered. And the Court of Appeals ruled that under that, under this very similar circumstances and similar language, that there was no coverage. State Farm owed no coverage for this, this preexisting noncompliant condition at the property. Counselor, the closest case I could find was Regents of Mercersburg College v. Republic Franklin Insurance. It's a 2006 Third Circuit case. And in, in that case, the cause of loss was a fire to a building. And the Third Circuit found that the insurance company was responsible for coverage. The issue was that the building was out of ADA compliance. And so when they rebuilt it, they had to redo the doorways, redo access, redo everything, and it was much more expensive. But there was, there was coverage found in that case. How would you distinguish that? So that, that, if, if the damage, so, so again, we can, we'll turn it back to the, the Reimer Mall. If a, say a, somebody coming into the mall, their brakes fail, they crash through the front door of the mall, and, and that the opening of the mall prior to this event was not compliant with ADA. In that event, if Cincinnati's the insurance company, Cincinnati's going to have to go and pay for the costs associated to make that, that damaged property caused by a covered cause of loss compliant. That, that is, that, that's the, the coverage they're providing under the policy. And again, the, I, I want to emphasize that the specific code provision being discussed requires that the property be undamaged. The code provision or policy provision? Policy provision, excuse me. Let me ask you this, and I'm still struggling with, with interpreting this policy. Let's say there was a, a storm that, that basically destroyed or ripped off half of a, a roof of a commercial structure. And let's say the building inspector came in and said, look, we have new, when you build, you need to reinforce these roofs. You know, we have a new, new code provisions. You need to use double the amount of steel. I assume that the half of the roof that was destroyed, you would replace with the double steel, and you would pay for that. Is that correct? I would say it would depend, it would certainly have, the carrier would certainly have to pay for that half. If not, if, if, if the requirement, in, in your scenario, half of the, half the roof's damaged, half is undamaged. If the code requirement also required that the undamaged half of the roof be brought to that same level, again, the carrier, if it was the Cincinnati policy, Cincinnati would be responsible for bringing that entire roof up to the code compliance. Even the parts that were undamaged? Even the parts that were undamaged. The loss occurred, a covered cost of loss occurred to half the roof. So in, in a sentence or two, how is that different from this case? In this case, again, the, there was no damage to the water-soaked roof. And, and that was. But in a hailstorm, there's no damage to most of the roof either, and they still get a new roof. Pardon? In, in a hailstorm situation, the hail only damages parts of the roof, and yet they get a whole roof replaced. I, I understand. In, in this particular case, as, as I've, I've indicated, you, you're talking about property that was damaged prior to the loss, as opposed to. Is that the, is that the key distinction then? In my hypothetical, the roof that's not damaged was not defective or damaged in any case prior to the loss. Exactly. And again, where specifically in the, in the policy is that? The ordinance or law, it, it goes, it, it's paragraph C of, ordinance was G under additional coverages. And if you look at what is C2, it refers, it explicitly states that Cincinnati will pay for the cost to reconstruct or remodel undamaged portions of that building or structure. And in this case, this, this. Is that undamaged? The only reason. Is that undamaged by the storm or undamaged period? It, that, the point being, it, it is, in this case, the only reason the roof needs to be replaced is because of its prior existing condition, its prior water-soaked condition. Nothing to do with the storm. Nothing, there's no causal link between the storm and the requirement that RIMER needs to replace the roof. RIMER needed to replace the roof since 2014. Is it the argument, though, they couldn't replace the damage, the portions damaged by the tornado without replacing the whole roof? And you're suggesting that's not factually true? They, in fact, what's factually true is they completed the repairs. They completed the repairs to the cap flashing prior to the appraisal of the loss. All that was, all of that was repaired prior to when the appraisal occurred. They had already replaced the cap flashing. Thank you, counsel. Thank you. Mr. J., do you have two minutes and 19 seconds? I've got a lot to get through. A couple quick points. I disagree that there's no causal link between the storm and the repairs. That's that 1,200 square feet of damage we talked about. And where specifically, I mean, is that in the appraisal report? Is that, where do I go to find that 1,200? If you go through the addendum, you have to, I guess, arguably put a couple pieces together. You've got an appraisal award that has approximately $30,000 of damage for the roof replacement. There's a subsequent email from one of the panel members. There's two documents, diagrams that were created by one expert and one panel member that highlight the area. One of the emails describes 120 linear feet to the cap flashing, plus 10 feet in to the field of the roof. That's 1,200, or that's 1,200 square feet of roof. I can tell you that if the panel was only awarding for five pieces of cap flashing, that is the most expensive cap flashing ever if that five pieces cost $30,000. So putting those together, it tells a pretty clean narrative that it's 120 feet of cap flashing, 10 feet in from there, 1,200 square feet of the roof. We talked a little about this damage on damage. My concern with this analysis that the additional coverage only applies if it's a direct cause of loss, to me that makes that cover superfluous. That makes it part of the primary coverage. If the roof was hit by a piece of metal, you would never trigger the additional coverage. That's a primary coverage. To create this burden that we only get the additional coverage if it walks and talks like the primary coverage, that makes it completely superfluous. The last point I wanted to talk about before closing was the reference to the St. Matthews case. There was a Minnesota Court of Appeals case that is pending oral argument before the Minnesota Supreme Court. And I would offer to the court that regardless of what decision they make, whether the Supreme Court affirms or reverses, it supports Reimer's position today. That case, I think, really held on the connectivity of parts that had to do with damage to drywall and a CMU wall. The Court of Appeals said those are unrelated, they're not connected. Here, it's our position that there's an undisputed connection between that 1,200 square feet of roof that needs to be replaced from the appraisal award and the building code. So in closing, as I started with, it's all about this 1,200 square feet. We can't make the repairs from the award, and we're asking you to reverse the district court's decision. Thank you, Your Honor. I'd like to thank both counsel.